# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN FITZGERALD, | : |
| Petitioner, | :     Civ. No. 14-4025 (KM) |
| v. | :     **OPINION** |
| STEPHEN D'ILIO, et al., | : |
| Respondents. | : |

**KEVIN MCNULTY, U.S.D.J.**

## I.    INTRODUCTION

The petitioner, John Fitzgerald, is a state prisoner currently incarcerated at the New Jersey State Prison in Trenton, New Jersey. He is proceeding *pro se* with a habeas petition pursuant to 28 U.S.C. § 2254. Mr. Fitzgerald[1] was convicted by a jury in 2005 of multiple drug offenses and is currently serving a sentence of life imprisonment plus twenty years with a thirty-five year period of parole ineligibility. He raises multiple claims in this habeas petition, ranging from ineffective assistance of counsel to errors regarding the admission of evidence and incorrect jury instructions. For the following reasons, the habeas petition will be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Fitzgerald was acquitted of all the substantive CDS and weapons offenses that were alleged to have occurred in Newark. He was convicted of those CDS offenses that occurred in Elizabeth. He was also convicted of certain leadership/conspiracy offenses: first-degree being a leader of a narcotics trafficking network, second-degree conspiracy to distribute heroin or

---

[1] References herein to "Fitzgerald," unless otherwise specified, are to John Fitzgerald, the petitioner,

cocaine in a quantity of five ounces or greater, and second-degree employing a juvenile in a drug distribution scheme.

The following factual background is taken from the opinion of the Superior Court of New Jersey, Appellate Division, dated June 30, 2008, which affirmed the convictions of Fitzgerald and his three codefendants. (*See State v. Fitzgerald*, No. A-1282-05T4, 2008 WL 2572617 (N.J. Super. Ct. App. Div. June 30, 2008).) Because Fitzgerald's convictions were for, *inter alia,* leadership of a trafficking network and conspiracy, certain acts of codefendants are relevant to Fitzgerald's conviction. For ease of reference, however, portions of the Appellate Division's summary of the evidence that specifically relate to the actions of John Fitzgerald himself are emphasized in *italics*.

> Defendants, Dawmeen, Dawshon and Dawud, are brothers; John is their uncle. Much of the evidence presented by the State at trial against these four defendants was obtained as a result of wiretap applications and search warrants; the State also presented the testimony of police officers and two co-conspirators. This evidence permitted the jury to find that defendants operated a large-scale drug distribution network.
>
> In gathering this evidence, the police applied for and were permitted in November 2002 to intercept calls to phone numbers assigned to Tamisha Fitzgerald, 17 Mravlag Manor, Elizabeth. By way of a 281-page affidavit dated December 16, 2002, the police obtained "no-knock" search warrants for various locations in Elizabeth, Newark and Roselle.
>
> **A. *The Search Warrants***
> The warrants were executed at ten different locations in Elizabeth, Newark and Roselle at 6:00 a.m., on December 17, 2002. In considering the weight of the evidence amassed by the State against defendants, it is helpful to review the results obtained from the search warrants.
>
> [1.] *82 Second Street, Apartment Two, Elizabeth.*[FN 1] The police forced open the doors of this apartment and chased Angel Aviles, Shariek Hiett and Duane Wells, to the third floor. Wells "discarded some narcotics," later confirmed to be twenty bags of heroin, as he ran. All were quickly apprehended. Kiahna Hall, Terry Williams, Sherrod Britt, Cynthia Lewis, Leon Jenkins and Erick Faulk were also found inside the apartment. When the police ordered Aviles, Hiett and Wells to show their hands, Hiett

2

placed six "bricks" of heroin on the step next to him.[FN 2] The heroin discarded by Wells was an "open brick."

> [FN 1] The apartment building is within 1000 feet of two elementary schools and within 500 feet of a public park.

> [FN 2] A brick of heroin is fifty smaller bags, usually wrapped tightly in newspaper or other type of paper.

After the individuals found in the apartment were "transported for processing," thirty-three gold-capped vials[FN 3] containing cocaine were found on the floor where Wells was seated; Wells was also found in possession of $79 in cash. Aviles had six bags of heroin in his right pants pocket and $126 in cash. The police found five bricks of heroin wrapped in "lottery paper" in a Knicks jacket, as well as a Nextel cell phone, charger, binoculars, and two Motorola "walk about walkie-talkies" in the kitchen. The cell phone recovered was identified as one of the phones subject to the wiretap. Its directory included private service numbers, which allowed the use of the "push-to-talk" or a "direct connect number" for Dawshon and Dawud; both of those phone numbers were also subject to the wiretap. The directory of the seized cell phone included telephone numbers for, among others, co-conspirators Tyshon Jones, Charlotte Hall, Marc Stuckey, Jamarl Maye, and Aviles.

> [FN 3] A vial is a clear glass container used to package CDS, normally cocaine.

At trial, Aviles and Britt testified for the State that the CDS found in the apartment was "possessed with the intent to distribute." Aviles identified the "Rush" stamp on the heroin envelopes as the "Fitzgerald brand heroin," which was being sold at the apartment that morning. Britt testified that the cocaine belonged to Dawmeen.

In one of the bedrooms, the police found $187 in cash on top of a dresser. On a coat rack in another bedroom, the police found a "Phat Farm brand coat" containing five bricks of heroin and another jacket containing 100 vials of suspected cocaine. In a third bedroom, police found $464 in cash in a dresser and a record book with the words "record holla" on the cover; Aviles testified at trial that this book contained "drug records in terms of how much have [sic] been received and sold and money passed back." A "red talk about radio walkie-talkie" was found in a coat in the front bedroom. Aviles testified that the walkie-talkies were used by the lookouts outside of the building.

2. *84 Second Street, Apartment Four, Elizabeth.* The six-unit apartment building at 84 Second Street is "connected physically" to the buildings at

80 and 82 Second Street. Once secured, the police found Amatullah David and Jahmin Muse in the first bedroom and Marc Stuckey in the second bedroom. The police seized $208 from Stuckey and $195 from David.

In the room where Stuckey was found, the police found "items that are consistent with packaging of drugs for distribution"-namely, two digital scales, two tape dispensers, an empty box of sandwich bags, a box of small wax or glassine envelopes, an ink pad and two boxes of rubber bands.[FN 4] A small ceramic saucer and a small "utensil type of tool" with a spoon on one end and point on the other were found in the same location.

> [FN 4] A detective testified at trial that, in the drug trade, a single dose of heroin is first weighed using the scale and then packaged by placing the drug in a wax envelope, sealing it with tape, and stamping the envelope with a "particular brand."

In the closet, the police found a pair of black Adidas tennis shoes containing twenty-four wax envelopes of heroin, two pink-capped vials of cocaine and another bag of cocaine. On the floor of the closet were two other bags-one bag contained fifty vials of cocaine with either pink or blue caps and two wax envelopes of heroin, and the other bag contained twenty bags of vial caps in various colors, twenty boxes of vials, and some wax envelopes. A child's backpack, also found in the closet, contained four boxes of empty wax envelopes (some were stamped "Mo Money" in blue ink), two ink stamps for "Mo Money" and "Da Take Over," three blue ink stamps, a metal strainer, a small glass pestle and a bag with suspected cocaine. According to expert testimony, the stamps are of the type used to designate the dealer's "brand name."

The search also uncovered surveillance equipment, namely, a small camera on the back porch pointed at the stairs and connected to a monitor in the living room of the apartment. In the kitchen, the police found "several hundred very small empty plastic ziploc type bags." Walkie-talkies were found in the first and third bedrooms.

3. *42G Mrvalag Manor, Elizabeth.* The police found Dawmeen, Laquanda Boone and a child under the age of one inside this apartment. No drugs were found.

In a basket of papers in one of the bedrooms, the police found Dawmeen's birth certificate and a letter addressed to "Doc" at 651 Elm Street in Roselle. Also found was $39,796 in cash in a dresser drawer and $16,000 in cash in a laundry basket next to the dresser. In the other bedroom, the police found $2,352 in cash in a purple bag stashed between the mattress

and springs of a baby crib. In the living room, the police found a bag containing $31,000 in cash that fell out when the couch was flipped over.

The police found a Nextel cell phone that had "connections" to the phones subject to the wiretap used by Dawshon and Dawmeen.

4. *636 Franklin Street, Second Floor, Elizabeth.* After forcibly entering this apartment, the police found Dawud, Laverne Graves and Melissa Jeter inside. No drugs or drug paraphernalia were recovered.

Two cell phones were found. One of the phones was subject to the wiretap and contained several "entries," including the push-to-talk numbers for Dawmeen, Dawshon and other co-conspirators.

The police also found mail addressed to Dawud at 636 Franklin Street, second floor, Elizabeth, a letter addressed to "Duke" and "Dukeman," and a New Jersey picture identification of Dawud.[FN 5] The police also found a car title in the name of Aviles.

> [FN 5] The parties stipulated that Dawud lived at this address and was known as Duke or Dukeman.

Sergeant John Murphy testified that he found $6,010 in cash in a "red Madeline bag" at the foot of the bed in the front bedroom of the first floor. Although Murphy testified that he searched the first floor, the State sought to prove that Murphy's recollection was incorrect and that he actually searched the second floor, which was covered by the search warrant. Another officer testified that he recalled Murphy searching the second floor apartment with him. And a detective testified that he received the $6,010 in cash from Murphy and, although he did not know which floor it was recovered from, he testified that Murphy searched the second floor of the apartment where he (the detective) had also been searching.

Paperwork, receipts, photographs and a checkbook were found in a shoe box in a closet in the front bedroom. A receipt showing that Dawud, listed as "Duke Fitzgerald," paid $2,000 for the November 2002 rent on 82 Second Street, apartment two, was also found in that box.

In the back bedroom, the police found $437 in cash, and a pair of pants containing Dawud's New Jersey driver's license, which listed 636 Franklin Street as his residence.

5. *307 Clinton Place, first floor front apartment, Newark.* This location is within 100 feet of an elementary school. The police found the first-floor front left apartment empty; it did not appear to be lived in "on a regular basis." In the bedroom night stand, the police found two handguns: an

Intratec 9 (Tec-9) and a Glock .40 along with an extended clip. The police also found a loaded .32 caliber handgun with four extra rounds in a dresser, and a digital scale still in its original packaging in a hall closet.

The Tec-9 was found to be operable, with a capacity of over fifteen rounds. Aviles testified that both the .32 and .40 caliber weapons were kept at 82 Second Street, and at times he carried the Tec-9 for protection. Britt testified that he also carried the Tec-9 when he left the building, and the .40 caliber gun belonged to Muse.

6. *651 Elm Street, Roselle.* When the warrant was executed, Laverne Jackson, Jameica Jackson, and three children, between the ages of six and twelve years old, were found inside. Franklin Jackson, Sr. was stopped by the police outside of this single-family residence.

In the first floor bedroom where Jameica was sleeping, police found $431 in cash. In the same room, they found a plastic bag containing $6,001 in cash, and two Gucci bags, each containing $2,400 and $2,000 in cash. The police also found a small unlocked safe containing $93,515 in cash and a plastic bag with $1,810 in cash. The parties stipulated that the police found several bags containing paperwork in a bedroom closet, including letters and bills addressed to Dawmeen at 651 Elm Street.

A green container, found in the master bedroom, contained various bills in the name of Jackson, Sr., and a May 28, 2002 bail receipt signed by Jackson, Sr., for Britt. A large locked safe was found in the master bedroom containing $445,450.

7. *414 Franklin Street, Elizabeth.* The police forcibly entered this single-family house. In a bedroom where Theodore Wayne Patterson was located, the police found a grinder with a "yellowish white" residue, a scale, "a jar containing a white powdery substance," which was later determined to be baking soda, thirty-eight bags of 100 gold caps each, and twenty-eight boxes each of which contained 100 clear vials, which are typically used to hold cocaine and heroin.

8. *271B Third Street, Elizabeth.* In the rear bedroom, the police found a shoe box on top of a pile of clothes behind the door. Inside the box were various items, including stamp pads, tooth brushes, loose rubber bands, a phone card, soap with a white powdery substance on it, and a box of glassine envelopes. In the same pile, the police found a plastic bag with nineteen more boxes of glassine envelopes and a bag with "a brown substance in it."

9. *307 Clinton Avenue, first floor rear apartment, Newark.* Tyshon Jones was found inside this apartment. In a hall closet, police found a "Papaya

bag" containing rubber stamps, stamp ink pads, dust masks, a small digital scale, and a ziploc bag containing smaller ziploc bags. Other similar materials were found in other locations in the apartment.

In the pantry, the police found three plastic bags that contained smaller bags with "a white rock-like substance" in one bag, a brownish powder in two others, and two dinner plates holding suspected drug residue. A "Sprint phone document" bearing the name Tyshon Jones was found in the kitchen hutch along with a black plastic bag filled with "a powder." On the table, police found a white plastic bag with four razor knives. Two Western Union receipts in Jones's name were found above the refrigerator.

In a dresser in the master bedroom, the police found nineteen rubber stamps, several plastic spoons, ink pads, a bottle of ink, playing cards, and a card bearing the name Angel Aviles. Aviles testified that he left his plastic identification card there "so we could use it to chop up the dope." A Sprint cell phone was found on the floor near the window. Also found was a cable television bill in name of Jones and a Nextel cell phone bill in the name of Tamisha Fitzgerald.

In the second bedroom, police found sixty cardboard boxes containing approximately 36,000 glassine bags; some were marked with a stamp and others were new and unused. The closet also held boxes of scotch tape, tape dispensers and "thousands" of rubber bands in boxes. A box with 162 glassine envelopes were stamped and contained a white powdery substance. The closet also contained a folded white paper with white powder in it, a bottle of quinine, and a black "Dr. Jay's bag" containing various packaging material and an identification card for Aviles.

In a hall closet, police found eight electric coffee grinders, some of which appeared to have been used for "grinding some type of white powder."

10. *607 South Park Street, second floor, Elizabeth.* After forcibly entering this single-family residence, the police found Dawshon and Jewel Jones in one bedroom; Jewel Jones's adult brother and two small children were found in other bedrooms.

The police found two digital scales and seven boxes of ammunition for .40, .45 and .38 caliber weapons in a utility closet. In the master bedroom, police found Verizon cellular telephone bills in Dawshon's name, utility bills in Dawshon and Jewel Jones's name showing an address of 607 South Park Street, a $1,698.16 Nextel phone bill in the name of "Tamisha Fitzgeral[d]," a gas bill addressed to Jewel Jones at 311 Franklin Street, a gas bill addressed to Dawshon at 607-609 South Park Street, a December 1, 2002 rent receipt with the name Terry Williams and an address of 82 Second Street, apartment two, Elizabeth, a money counting machine, a

letter from Tyshon Jones addressed to Dawud and Dawshon, a bank card and a New Jersey identification card in Dawshon's name in the dresser, a "drug record" notebook with dates and numbers, a bag of cash in the dresser, a bag of cash in the entertainment center, and two Nextel phones. The police also discovered "thousands of dollars in cash" in plastic bags, a shoe box and dresser drawers. In total, the apartment search uncovered $90,728 in cash.

One of the phones that was seized there was subject to the wiretap. The "address portion of the phone" had three "entries" for Dawmeen, including his home and push-to-talk number. There were also entries for other co-conspirators. A second phone that was found belonged to Jewel Jones and had listings for Dawshon and Dawud at numbers that were subject to the wiretap.

## B. *Aviles's Testimony*
Along with the considerable evidence obtained through the execution of search warrants and wiretaps, the State presented at trial the testimony of Aviles, who testified that he was "engaged in the active distribution of narcotics" during the time of the investigation, i.e., November 19 to December 17, 2002.[FN 6] Aviles testified that he and other "workers" were paid each week by Dawshon, Dawud, or someone else on their behalf, from "a bundle of cash."

> [FN 6] In August 2002, Aviles agreed to testify against defendants "based upon a plea to certain charges and an agreement to testify." Aviles had four matters pending at the time; two were dismissed and Aviles pled guilty to the other two, receiving two consecutive ten-year sentences, each with a four-year period of parole ineligibility. Aviles acknowledged that he accepted a plea bargain in exchange for his testimony against defendants because he wanted to get out of jail as early as possible. He accepted the plea agreement before the indictment against defendants and the others was returned.

Tapes of intercepted calls were played for the jury, and Aviles testified as to the individuals involved and interpreted the content of the conversation for the jury.

In the first conversation played for the jury, Dawud told Aviles that a "narco" or police car with a specific license plate was in the area and directed the workers selling drugs at 82 Second Street to be careful. Using walkie-talkies, Aviles then warned the lookouts. In other calls, Dawud gave Hiett approval to sell a whole brick of heroin for $300, rather than the normal price of $350, checked on the supply of drugs, and whether

they "opened" for business on time. In one call, Dawud checked with Tyshon Jones to make sure they had enough heroin to package.

In another conversation, Dawmeen called to warn about police in the area and to determine whether Aviles either had "locked down" or already "closed down the house," meaning a cessation in the selling of drugs. Almost one-half hour after one call, Dawmeen called back to report that "everything's clear," and Aviles "[r]eopened" for business. Aviles testified that he spoke to defendants about police activity in the area "[a]lmost on an everyday basis." In another conversation, Dawmeen called Aviles to complain that the lookouts were just sitting on the porch and instructed Aviles to get them to their "post[s]." Dawmeen also called to check on the supply of cocaine.

In several conversations played for the jury, Aviles called Dawshon and said "[n]eed you," or "down to our last ten," meaning he was running low on drugs. In another call, Hiett told Dawshon to bring more heroin. Dawshon also called Aviles to check on how many bricks of heroin Aviles had left.

There were other conversations in which Dawshon called about a shortage of money or about keeping the money for the cocaine and heroin separate. For example, Dawshon called Aviles to report that he got only $136 for a brick of heroin, when the normal price was $350. They then argued about someone named April who "took a hundred," meaning $100, and "two wake-ups," meaning two bags of dope.[FN 7]

> [FN 7] Aviles explained that many of the people working for defendants were addicts, who often were given "wake-ups" "so they wouldn't be sick."

Dawshon placed another of these calls because Aviles had paid Dawud for fourteen bricks, instead of fifteen bricks, and Aviles had to go outside to bring Dawshon the rest of the money. Dawshon also spoke to Aviles when the $350 bricks were "coming up 300" instead. On several occasions, Dawshon told Aviles that he would be held responsible for the difference in price if bricks were sold for $300 without prior approval or if the money collected was short.[FN 8]

> [FN 8] Aviles was supposed to give Dawshon $350 for every brick of heroin sold. Dawud and Dawshon had to approve sales of whole bricks for $300 because they thought Aviles or Williams were "making it up to take the $50 off." The bricks consisted of five bundles of envelopes, with ten envelopes in a bundle, wrapped around a lottery ticket using rubber bands. To "brick it up" meant to wrap

the envelopes together with the lottery tickets. Each envelope was sold for $7, even though the "going rate" in Elizabeth at that time was $10. A "wall" or "pack" of cocaine consisted of 100 bottles. Getting the "walls up" also referred to money.

*Aviles testified that he sold drugs, specifically heroin and cocaine, under Dawshon's "direction" and that he also took "directions and orders" from Dawud and Dawmeen, but not John. Aviles testified he was "hired" in 2000 to drive Dawmeen around but then later went to work with Dawshon and Dawud selling heroin. Aviles called John "one of the workers," and he testified that he also sometimes gave John instructions; he did not view John as a "leader" in the organization.*

When asked to describe the division of labor among the defendants, Aviles testified that Dawshon "did the dope," Dawmeen "did the coke," and Dawud "just made sure everything ran, ran right." *When asked if John had "a role in supervising any of the other lookouts," Aviles responded "[y]ou could say in a way." Aviles also said that John was supposed to be a lookout, but he "didn't do anything"; John "just hung out outside, drank beer and got high." However, when the other defendants were around, John would do "what he was supposed to do" and make sure "his face was seen."*

*John was only involved in a couple of the intercepted phone calls. In one, John and Dawud discussed starting a "war" with other drug dealers; in another, John is overheard telling Williams to open the door to 82 Second Street and talking about needles used to "shoot dope."*

Aviles testified that he starting "serving people" just before 5:30 a.m. each morning. Based on one conversation between Dawud and Aviles, Aviles once had 100 people waiting in line to buy drugs and sold twenty-one bricks of heroin before 3:00 p.m. that day. Aviles also testified that statements made during a conversation between Hiett and Dawud demonstrated that they had sold eight bricks by 9:17 a.m. that morning. Aviles testified that he could "go through" or sell more than thirty-seven bricks of heroin in the course of a day.

Aviles identified the individuals involved in the drug trafficking. Dawud usually brought the drugs to 82 Second Street, apartment two, where Aviles lived, but Dawmeen and Dawshon "usually had somebody do it for them," like Wayne Patterson. Muse lived upstairs from that apartment and sometimes assisted defendants in transporting drugs until he was forcibly "kicked out of the organization" for "putting his own product in the building." Britt worked as a lookout and "inside sometimes." Hiett, a juvenile at the time, "played a role in picking up money and transporting

10

money." Maye would drive people from the "lab" in Newark, where drugs were "mixed" or "cut" and packaged, to the apartment at 82 Second Street. Tyshon Jones also made "runs" between Newark and Elizabeth. Marc Stuckey sometimes assisted Aviles in selling and storing drugs at 84 Second Street, apartment four. Charlotte Hall, one of Dawshon's girlfriends, used to drop off drugs after they had been packaged.

Aviles also testified that he worked "out there"-meaning Newark-on occasion. The drugs were mixed in Newark using dinner plates, like the ones found during the search of 307 Clinton Avenue. Dawshon had several people who worked for him in Newark to "help bag up" the drugs; one lengthy intercepted conversation referred to delays in "bagging up" and problems with those doing the packaging. Fifty-five bricks of heroin, or normally a "plate and a half," could be prepared at the Newark lab in a day. There were several intercepted conversations during which Dawshon checked on how many bricks had been prepared.

Aviles also described how the operations at 82 Second Street, apartment two, were conducted. He testified that drugs were brought in the front door and customers-approximately a "couple hundred" per day-were served at the back door. "Anywhere from 50 to 70" bricks of heroin were sold each day, and "[a]nywhere from five to ten" packs or bags of cocaine were sold each day.[FN 9] At 10:00 p.m. each day, Aviles would hide the remaining drugs and write down a record of the drugs he sold and the money he collected.

[FN 9] A pack or bag consisted of 100 bottles of cocaine.

Aviles testified that Dawshon was primarily responsible for picking up the heroin, usually in quantities of a half or whole kilogram, which cost approximately $60,000. The heroin would be packaged into small ziploc bags first and then repackaged into even smaller quantities.

In an intercepted conversation between Dawud and Dawshon, Dawud stated that he was bringing money for ten bricks of heroin to Dawshon's house on South Park. Dawmeen collected the money for the cocaine and thereafter threatened harm when he thought Aviles or Hiett were selling their own drugs instead of his.

### C. *Britt's Testimony*
The State also relied upon the testimony of Sherrod Britt, who was then serving a sentence of eighteen years with eight years of parole ineligibility.[FN 10] At the time of the investigation, Britt acknowledged that, with Aviles and Hiett, he was "selling drugs on a daily basis" for Dawshon at 82 Second Street in Elizabeth. Britt testified that he was paid by Dawshon, but the money was delivered by Tyshon Jones. On cross-

examination, Britt agreed that he and Aviles "were actually running 82 Second."

> [FN 10] On March 28, 2003, Britt pled guilty to possession of CDS with the intent to distribute a first-degree weight, i.e., over five ounces of heroin; the remaining counts of the complaint were dismissed against him. Britt admitted that the reduced sentence "played a part" in his decision to plead guilty, and the plea was conditioned upon him giving testimony against defendants. Britt also had two other earlier open matters; he pled guilty "to a 1000 foot case" and was sentenced to a concurrent five-year sentence with two years of parole ineligibility. He also pled guilty to possession of CDS with the intent to distribute and was sentenced to a consecutive term of five years with two years of parole ineligibility. Britt had two other prior convictions for selling CDS and joyriding, and had previously served a three-year term.

Britt identified the roles of others in the organization. Tyshon Jones "did all the bagging up" of the heroin at 307 Clinton Place in Newark, Muse and Maye dropped off heroin and collected money, Patterson dropped off cocaine, Terry Williams opened the door for customers at 82 Second Street in order to manage the "heavy traffic flow," Leon Jenkins built places to stash money and reinforced the door at 82 Second Street, Al Raheem Campbell was "more or less a supervisor" and "basically watch[ed] over" the apartment to "make sure everybody was doing what they supposed to be doing," Stuckey "help[ed] out" if they were "shorthanded," Eric Fault and John Fitzgerald served as lookouts, Hiett "played like several different roles" including counting money, Charlotte Hall, who was identified as Dawshon's "mistress," stamped the bags of heroin at 307 Clinton Place, and Jewel Jones collected money a few times.

*According to Britt, John Fitzgerald was "in charge of the lookouts" and "made sure all the lookouts [were] at the locations they were supposed to be at." John's main "post" was the back porch, and he stayed in touch using the walkie-talkies. "[W]hen there was heavy police activity," John would supervise up to five or six lookouts. On cross-examination, Britt admitted that John "would often be out there drinking," and often, as a result of being either high or drunk, John did not show up for work. Britt also acknowledged that John "was put to menial tasks" since "he wasn't competent enough because he was high or drunk most of the time" and that he (Britt) or Aviles actually hired and paid the lookouts.*

Britt echoed Aviles's testimony regarding the business at 82 Second Street. He testified that drugs were dropped off through the front of the building

and customers were served at the back door. It was "Dawshon's rule" that no customers were allowed in the apartment when drugs were being dropped off. If police were in the area, customers were allowed to use the drugs in the bathroom or in Williams's room. In order to avoid problems with neighbors, the lookouts outside the apartment were supposed to make sure no one used drugs outside the building.

Like Aviles, Britt testified that Dawmeen was "in charge of the coke." Britt identified his own voice in several of the intercepted calls, including one where he told Dawmeen that he needed "more dog food," which meant he was "running low" on cocaine. In another call, Dawmeen told Britt to get money from Aviles and bring it to him on Elizabeth Avenue.

Britt called Dawshon if he ran low on heroin and Dawmeen if he ran low on cocaine. The supply of heroin was "refilled" two or three times a day. Britt testified that he would normally sell about sixty-eight bricks of heroin in a day and "pushing on 80" on some Saturdays. The money collected would be given to the person who brought the next supply of heroin to the apartment. Dawshon collected money from the drug proceeds "maybe four times, five times out of the week during the nighttime."

"About $2500 worth" of cocaine was sold in a day at 82 Second Street and "a little more on the weekend." Cocaine was packaged in $500 bags containing 100 bottles, each worth $5. On an average day, between 500 and 600 customers purchased heroin and cocaine at 82 Second Street.

Britt testified that Dawud's "role" in the organization was "like the enforcer," that Dawud "made sure everything overall, the coke and dope, all the money was correct." Dawud also "made sure we was up on time, he made sure that nobody came late," and he appeared at 82 Second Street "on a daily basis" to watch over things. If the workers did not do what they were supposed to do, Dawud docked their pay. Dawud also informed Britt to make sure customers were not police officers by checking for needle marks, "mak[ing] them sniff in front of me [to] make sure they got high" or patting them down to check for a "wire." Britt testified that Campbell also performed that function, but Britt would not agree that Campbell was "more of a supervisor than Dawud."

## II
Based on this and other evidence, the jury convicted Dawmeen, Dawud and Dawshon on all charges, namely: the first-degree offense of being a leader of a narcotics trafficking network, *N.J.S.A.* 2C:35-3; second-degree conspiracy to distribute heroin or cocaine, in a quantity of five ounces or greater, *N.J.S.A.* 2C:5-2; *N.J.S.A.* 2C:35-5(a)(1); *N.J.S.A.* 2C:35-5(b)(1); second-degree employing a juvenile in a drug distribution scheme, *N.J.S.A.* 2C:35-6; first-degree maintaining or operating a CDS production

facility, *N.J.S.A.* 2C:35-4; third-degree possession of heroin in Newark, *N.J.S.A.* 2C:35-10(a)(1); first-degree possession of heroin in Newark with the intent to distribute, *N.J.S.A.* 2C:35-5(a)(1); *N.J.S.A.* 2C:35-5(b)(1); third-degree possession of heroin in Newark with the intent to distribute within 1,000 feet of school property, *N.J.S.A.* 2C:35-7; third-degree possession of cocaine in Newark, *N.J.S.A.* 2C:35-10(a)(1); second-degree possession of cocaine in Newark with the intent to distribute, *N.J.S.A.* 2C:35-5(a)(1); *N.J.S.A.* 2C:35-5(b)(2); third-degree possession of cocaine in Newark with the intent to distribute within 1,000 feet of school property, *N.J.S.A.* 2C:35-7; third-degree possession of heroin in Elizabeth, *N.J.S.A.* 2C:35-10(a)(1); second-degree of possession of heroin in Elizabeth with the intent to distribute, *N.J.S.A.* 2C:35-5(a)(1); *N.J.S.A.* 2C:35-5(b)(2); third-degree possession of heroin in Elizabeth with the intent to distribute within 1,000 feet of school property, *N.J.S.A.* 2C:35-7; second-degree possession of heroin in Elizabeth with the intent to distribute within 500 feet of a public park, *N.J.S.A.* 2C:35-7.1; third-degree possession of cocaine in Elizabeth, *N.J.S.A.* 2C:35-10(a)(1); third-degree possession of cocaine in Elizabeth with the intent to distribute, *N.J.S.A.* 2C:35-5(a)(1); *N.J.S.A.* 2C:35-5(b)(3); third-degree possession of cocaine in Elizabeth with the intent to distribute within 1,000 feet of school property, *N.J .S.A.* 2C:35-7; second-degree possession of cocaine in Elizabeth with the intent to distribute within 500 feet of a public park, *N.J.S.A.* 2C:35-7.1; first-degree financial facilitation of criminal activity, *N.J.S.A.* 2C:21-25(a); third-degree unlawful possession of a weapon in Newark, *N.J.S.A.* 2C:58-5; *N.J.S.A.* 2C:39-5(f); and second-degree possession of a firearm in Newark during the commission of the crime of possession of CDS with the intent to distribute, *N.J.S.A.* 2C:39-4.1(a). After merging some of these convictions for sentencing purposes, Dawmeen, Dawud, and Dawshon each received an aggregate term of life in prison plus one-hundred years with a sixty-five-year period of parole ineligibility.

> *John [Fitzgerald] was acquitted of all the drug and weapon offenses that were alleged to have occurred in Newark. He was convicted of those CDS offenses that occurred in Elizabeth, as well as first-degree being a leader of a narcotics trafficking network, second-degree conspiracy to distribute heroin or cocaine in a quantity of five ounces or greater, and second-degree employing a juvenile in a drug distribution scheme. He was not charged with first-degree financial facilitation of criminal activity. After the merger of some of the convictions for sentencing purposes, John received an aggregate sentence of life in prison plus forty years, with a fifty-year period of parole ineligibility.*

*State v. Fitzgerald*, No. A-1282-05T4, 2008 WL 2572617, at *1–10 (N.J. Super. Ct. App. Div. June 30, 2008).

There was one additional piece of evidence that specifically related to Fitzgerald, but was not summarized by the Appellate Division:

*The State also presented a videotape, in conjunction with testimony of a police officer, of a meeting between Mr. [John] Fitzgerald, a confidential informant, and an undercover police officer in which the individuals discuss arrangements for a potential drug transaction.*

(Transcript of video, Dkt. no. 13-14 at 31; *see also* Trial Transcript, Dkt. No. 13-30 at 116-122.)

Mr. Fitzgerald appealed his judgment and conviction to the Superior Court of New Jersey, Appellate Division. The Appellate Division affirmed the conviction on June 30, 2008, but remanded the case to the trial court for resentencing. The trial court ultimately resentenced Mr. Fitzgerald to a cumulative sentence of life plus twenty years with a thirty-five year period of parole ineligibility. The Appellate Division affirmed that new sentence on June 28, 2010. (*See* Dkt. No. 13-7.) The New Jersey Supreme Court denied certification on October 6, 2008. *See State v. Fitzgerald*, 960 A.2d 392 (N.J. 2008).

Subsequently, in March 2009, Mr. Fitzgerald filed a petition for post-conviction relief ("PCR") in the Superior Court of New Jersey, Law Division, Union County. Judge Wertheimer, who had presided at trial, denied the PCR petition on May 16, 2011. (I will refer to Judge Wertheimer, sitting in this capacity, as the "PCR court".) In doing so, he considered both the PCR petition submitted by Fitzgerald's appointed counsel and a parallel, pro se submission by Fitzgerald himself. (*See* Dkt. No. 13-14 at 25). Thereafter, on October 30, 2013, Mr. Fitzgerald filed an appeal to the Appellate Division, which affirmed the denial of the PCR petition. (*See* Dkt. No. 13-16.) The New Jersey Supreme Court denied certification on May 22, 2014. *See State v. Fitzgerald*, 91 A.3d 24 (N.J. 2014).

In June 2014, this Court received Mr. Fitzgerald's federal petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. The petition raises four grounds:

1. "Petitioner is entitled to post-conviction relief based on ineffective assistance of trial and appellate counsel"

2. "The trial court's charge to the jury regarding accomplice liability was inadequate, insufficient and fatally defective in nature"

3. "The trial court erred by ruling the video tape of the Defendant meeting with an undercover Officer and a confidential informant two weeks prior to the beginning of the conspiracy contained in the indictment was admissible"

4. "The trial court failed to adequately instruct the jury regarding the limited admissibility of the videotape."

Respondent was ordered to file an answer to the habeas petition. In addition to opposing these

contentions on the merits, the respondent asserts that Grounds Two, Three, and Four are

procedurally defaulted and that they raise only state-law issues, not federal constitutional issues

upon which habeas relief can be granted. Mr. Fitzgerald has filed a traverse. The matter is thus

fully briefed and ripe for decision.

## III.    HABEAS CORPUS LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state

court can be granted only for violations of the Constitution, laws, or treaties of the United States.

*See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1

(3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus

after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521

U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim

decided on the merits in state court proceedings unless the state court's adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

16

established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable-application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner has the burden of proof and with respect to § 2254(d)(1), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, the court will assume that, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501

U.S. 797, 803 (1991); *see also Wilson v. Sellers*, __ S. Ct. __, 2018 WL 1800370 (April 17,

2018). Additionally, AEDPA deference is not excused when state courts issue summary rulings.

For example, "[w]hen a federal claim has been presented to a state court and the state court has

denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

absence of any indication or state-law procedural principles to the contrary." *Harrington v.

Richter*, 62 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV.    DISCUSSION

### A. Ground One: Ineffective Assistance of Trial and Appellate Counsel

In Ground One, Mr. Fitzgerald argues that he received ineffective assistance of both trial

and appellate counsel. Specifically, Mr. Fitzgerald argues that his trial counsel was ineffective in

the following respects:[2]

1. Trial Counsel was Ineffective for his Failure to Adequately Challenge the Authorization of the Interceptions of Wiretap Communications.

   a. Trial Counsel Was Ineffective In His Failure To Request A Hearing To Challenge The Qualifications Of The Police Detectives And Expose Defects In The Affidavit.

   b. Trial Counsel was Ineffective for Failure to Move for Disclosure of a Confidential Informant Mentioned throughout the Wiretap Application Affidavit by Detective Sheridan.

2. Trial Counsel was Ineffective In his Failure to Adequately Challenge the Application for a No-Knock Search Warrant.

3. Trial counsel failed to do any investigation prior to trial and as a result failed to call favorable witnesses and interpose an alibi defense.

4. Trial counsel was ineffective in failing to file a Notice of Alibi defense and to use an alibi defense.

---

[2]    For Ground One, Mr. Fitzgerald relies upon and incorporates the facts, and presumably the arguments, presented in his PCR counsel's brief and in Mr. Fitzgerald's *pro se* brief, both submitted in support of his Motion for Post-Conviction Relief. *See* Petition, Attachment C ¶ 1. Mr. Fitzgerald did not file a separate brief in support of his petition for federal habeas relief.

5.   Trial counsel was ineffective in failing to adequately advise Petitioner of his plea offer.

*See* Dkt. No. 13-13 at pp. 26-33; 36-38; Dkt. No. 13-14 at pp. 1-5. With respect to his Appellate

counsel, Mr. Fitzgerald argues that "Appellate Counsel Failed to Argue That The Elements

Pursuant To The "Kingpin" Statute Were Not Met." *See* Dkt. No. 13-13 at pp. 33-35.

Additionally, Mr. Fitzgerald argues that his counsel was ineffective for (1) "trial counsel's

failure to raise an objection that the evidence was not sealed as required by law, and appellate

counsel's failure to raise this issue on appeal," and (2) "ineffective assistance of trial counsel and

appellate counsel due to trial counsel's failure to raise an objection to the chain of custody, as

there were no chain of evidence reports for the wiretap warrants and applications." *See* Dkt. No.

13-13 at p. 35.

The last decision on these claims was from the Appellate Division during Mr.

Fitzgerald's post-PCR proceedings. That appellate court, approving the reasoning of the PCR

Court, addressed these claims as follows:

> We find no merit to these contentions, Rule 2:11-3(e)(2), and
> therefore affirm substantially for the reasons stated by Judge
> Wertheimer in his thorough written decision of May 16, 2011. Suffice
> it to say, for defendant to obtain relief based on ineffective assistance
> grounds, he is obliged to show not only the particular manner in
> which counsel's performance was deficient, but also that the
> deficiency prejudiced his right to a fair trial. *Strickland v.*
> *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d
> 674, 693 (1984); *State v. Fritz*, 105 N.J. 42, 58 (1987). We are
> persuaded that the alleged deficiencies here clearly fail to meet either
> the performance or prejudice prong of the *Strickland* test.

(Dkt. No. 13-16 at p. 5.) In concluding that Mr. Fitzgerald's claims on appeal lacked merit, the

Appellate Division cited New Jersey Court Rule 2:11-3(e)(2)[3] and affirmed "substantially for the

---

[3]      The Rule provides: "When in an appeal in a criminal, quasi-criminal or juvenile matter, the
Appellate Division determines that some or all of the arguments made are without sufficient merit to
warrant discussion in a written opinion, the court may affirm by specifying such arguments and quoting
this rule and paragraph." N.J. CT. R. 2:11-3(e)(2).

reasons stated by" the PCR court. I will therefore consider as well the PCR court's reasoning on

Mr. Fitzgerald's claims. *Ylst*, 501 U.S. at 803; *Wilson*, 2018 WL 18000370 at *3.

The PCR court analyzed these claims as follows:

> The thrust of defendant's PCR, after reviewing his and counsel's submissions, is that he was denied effective assistance of counsel; it is well settled that the right to counsel afforded by the Federal and State Constitutions encompasses the right to effective assistance of counsel. *United States v. Cronic*, 466 U.S. 648, 653-54 (1984); *Reece v. Georgia*, 350 U.S. 85, 90 (1955); *State v. Allah*, 170 N.J. 169, 282-83 (2002). "The standard for the ineffective assistance of counsel under the New Jersey Constitution is the same as the guarantee under the federal constitution." *Id.* at 283.

> "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *State v. Fritz*, 105 N.J. 42, 58 (1987); *State v. Savage*, 120 N.J. 594, 613 (1990). A two-prong test is required. *Strickland*, 466 U.S. at 687. The defendant must show that counsel's representation was deficient, considering all of the circumstances. *Id.* at 688, 690. Such inquiry "must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'." *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 955, 101 (1955)).

> Second, the defendant must also show that counsel's ineffectiveness prejudiced him. "It is not enough for the defendant to show that the error or errors had some conceivable effect on the outcome of the trial." *State v. Sheika*, 337 N.J. Super. 228, 242 (App. Div. 2001). Rather, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, supra at 694; see, *State v. Fritz*, supra at 60-61. A reasonable probability is one sufficient to undermine confidence in the outcome. *State v. Fritz*, supra at 52.

> A reviewing court should also show deference to "strategically defensible," *State v. Hightower*, 120 N.J. 378, 402 (1990), tactical decisions "[e]ven if counsel made strategy miscalculations or trial mistakes." *State v. Buonadonna*, 122 N.J. 22, 42 (1991). In this regard, our Supreme Court has observed that counsel are "no more than human and

20

may, of course, make strategy miscalculations and trial mistakes." *State v. Dennis*, 43 N.J. 418, 428 (1964). It is also true that counsel may not be considered ineffective simply because counsel's strategy failed. *State v. Sheika*, supra at 243. Stated otherwise, in reviewing an attorney's tactics, a court must be wary of the "distorting effects of hindsight." *State v. Bey*, 161 N.J. 233, 251 (1999) (quoting *State v. Marshall*, 148 N.J. 89, 156-57 (1997)).

The vast majority of defendant's assertions should have been raised on appeal and not in the manner being conducted here. There was a plethora of motions by defendant's counsel and the co-counsel of the other three defendants, some of which defendant now attempts to resurrect, whose rulings are subject for appeal not for a PCR.

Reviewing the specifics of defendant's arguments concerning claims of ineffective representation, defendant's memory is either faulty or fanciful. For instance, his allegation that the application for the wiretap should have been challenged belies the fact that a Franks hearing was requested and denied. In fact, defendant raises a series of allegations, as more fully addressed in the State's brief, which was addressed at trial. The rulings on those are grounds for appeal, not a PCR.

The simple conclusion is that allegations of ineffective assistance of counsel are belied by the overwhelming evidence of each, and all, defendants' guilt. When it comes to specifics, this court can do no better than to refer to the well-balanced and accurate history contained in the State's brief as well as the State's reiteration of the applicable law, both of which this court incorporates herein in its totality.

It is, however, worthwhile to note that under the test enunciated in *Strickland, supra*, 466 U.S. at 694, in order to succeed in a motion such as this, even assuming arguendo defective performances by counsel that petitioner demonstrate "a reasonable probability that, but for counsel's unprofessional error, the result would have been different." Quite simply, in the face of the overwhelming proof in this case, the eyewitness identifications, the hours of audio-taped conversations implicating defendant directly through co-conspirators, and the *sub rosa* video tape taken of defendant inside a car orchestrating drug sales, petitioner's assertions of a right to Post Conviction Relief are absurd.

This court presided over the trial in question and had an opportunity to hear and see overwhelming evidence of guilt, weigh the believability of the witnesses and the impressive wiretap evidence and identifications. In 27 plus years on the bench, this court never saw such overwhelming evidence of each defendant's guilt. There was nothing that defendants' attorneys did not do or attempt to do that could have overcame the

mountain of evidence, the professional testimony of the constabulary or the damning ramifications of eyewitness identification. The petitioner cannot, therefore, demonstrate any possibility of a different result let alone a "reasonable probability" of same.

It is important to note that petitioner was one of four defendants who were not only related by blood but who also had virtually identical interests. Each defendant had experienced criminal defense attorneys to take all reasonable and cognizable steps to protect their interests. This consortium of competent criminal counsel did all that was reasonable and proper to keep damaging evidence from the trier of fact. While each lawyer may not have initially moved for a certain ruling, all joined in on each motion, and when taken together each defendant was competently protected by all the lawyers who sought to protect their joint and several interests. The court's rulings on these matters are for appeal.

(Dkt. No. 13-14 at pp. 26-28.)

The PCR court in turn, as stated in the above recitation, adopts the "history contained in the State's brief as well as the State's reiteration of the applicable law, both of which [the PCR] court incorporates . . . in its totality." (Dkt No. 13-14 at 27.) (The State's brief, which the PCR incorporated in part by reference, is in the record. (Dkt. No. 13-14 at 14)) The PCR court's incorporation of the State's recitation of facts or law is not grounds for habeas relief. Even a summary state court decision is entitled to due deference. And where the court has not merely ruled summarily, but also expressly adopted facts or reasoning from the State's brief, I will consider the brief insofar as it sheds light on the reasoning of the state court. Therefore, in order to review of the reasonableness of the state court's application of clearly established federal law with respect to Mr. Fitzgerald's ineffective assistance claims, I will, where necessary, refer to the discussion presented in the State's PCR brief and adopted by the PCR court. *See, e.g., Rhode v. Hall*, 582 F.3d 1273, 1282 (11th Cir. 2009) ("Despite the fact that the state habeas court adopted the State's facts verbatim, these findings of fact are still entitled to deference from this court . . .

."); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985) ("even when the trial judge adopts proposed findings verbatim, the findings are those of the court . . . .").[4]

## 1. Legal Standard for Claims of Ineffective Assistance of Counsel

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating an ineffective assistance of counsel claim. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Ross v. Varano,* 712 F.3d 784, 798 (3d Cir.2013). Petitioner must identify acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland,* 466 U.S. at 690. The federal court must then determine whether in light of all of the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. *See id.*

Second, a petitioner must affirmatively show prejudice, which is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir.2012). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir.2010) (quoting *Strickland,* 466 U.S. at 697).

---

[4]      *See also, Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 283 (3d Cir. 2016) ("Under § 2254(d), [when a state court issues a reasoned opinion,] a habeas court must determine *what arguments or theories supported* ... the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.") (citing *Wetzel v. Lambert*, 565 U.S. 520, 524 (2012)) (emphasis in original).

Where the court is assessing an ineffective assistance of counsel claim under AEDPA that was initially presented to the state court, the Supreme Court has imposed an additional barrier:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington,* 562 U.S. at 101 (internal quotation marks and citation omitted) (emphasis in original).

As discussed below, I find that the PCR Court did not unreasonably apply clearly established federal law. Nor was its denial of Mr. Fitzgerald's ineffective assistance claims based on an unreasonable determination of the facts. The court noted and reasonably applied the applicable standard and concluded that Mr. Fitzgerald had not satisfied either prong of the *Strickland* test. These claims therefore do not warrant granting federal habeas relief.

## 2. Ineffective Assistance of Trial Counsel

Mr. Fitzgerald argues that his trial counsel was ineffective for (1) failing to challenge the applications for the wiretaps and the "no-knock" search warrants, (2) failing to do any investigation prior to trial and, as a result, failing to call favorable witnesses, (3) failing to raise an alibi defense, and (4) failing to adequately advise Mr. Fitzgerald regarding a plea offer. I consider these contentions in turn.

### a. Wiretaps and "No-Knock" Search Warrants[5]

Mr. Fitzgerald argues that his counsel was ineffective for failing to challenge (or adequately challenge) the application for the wiretaps. Specifically, Mr. Fitzgerald argues that counsel should have requested a *Franks*[6] hearing to challenge the bases for the application and that counsel should have moved for disclosure of the identity of confidential informants who provided information used in the application. As discussed by the PCR court, and as demonstrated by the record, Fitzgerald's codefendants, in a motion joined by Fitzgerald, did indeed move for a *Franks* hearing. The trial court denied the motion. (*See* Dkt. No. 13-18 at p. 50.)

Mr. Fitzgerald seems to be arguing that his counsel should have filed a *separate and independent* motion challenging the wiretap application instead of joining in his codefendants' motion. The Superior Court was not unreasonable, however, in concluding that the codefendants "had virtually identical interests" and that "when taken together each defendant was competently protected by all the lawyers who sought to protect their joint and several interests." (Dkt. No. 13-14 at p. 28.) Moreover, Mr. Fitzgerald has failed to demonstrate prejudice, in the sense that any such hypothetical individual motion would have had a better chance of success than the joint motion. The joint motion did challenge the qualifications of the officers and the propriety of the affidavit in support of the wiretap request—the very things Mr. Fitzgerald here argues his counsel should have done. For all that appears here, Mr. Fitzgerald's challenge, even if made

---

[5]     Although the defendant does not say so, I will assume that presentation of these grounds via an ineffective assistance claim circumvents the bar on habeas review of a Fourth Amendment claim. *See Stone v. Powell*, 428 U.S. 465 (1976); *Goins v. Warren*, No. CIV.A. 13-4057 DRD, 2015 WL 1292528, at *4 (D.N.J. Mar. 20, 2015).

[6]     *Franks v. Delaware*, 438 U.S. 154 (1978).

separately, would stand or fall with those of his codefendants. Here, the Superior Court reasonably applied the *Strickland* standard.

Mr. Fitzgerald also faults his counsel for failing to move for disclosure of the identity of a confidential informant. The PCR court's conclusion that Mr. Fitzgerald suffered no prejudice was a reasonable application of the *Strickland* test. Mr. Fitzgerald proffers no more than a generalized and conclusory assertion that counsel's alleged lapse was "prejudicial because it precluded Petitioner from challenging the confidential informants' credibility with respect to the wiretap, [and] it also precluded Petitioner from being able to prepare an adequate defense at trial." (Dkt. No. 13-13 at p. 31.) The State's PCR Brief, adopted by the Superior Court (*see* Dkt. No. 13-14 at pp. 19-20), established that these vague assertions were insufficient to demonstrate that a motion to disclose would or should have been granted. In particular, there was nothing to establish the specific "substantial showing of need" for disclosure of confidential informants that is required by State law, *State v. Williams*, 364 N.J. Super. 23, 29 (N.J. Super. Ct. App. Div. 2003), or federal law, *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957). Nor did Fitgerald demonstrate a reasonable probability that disclosure, if it had occurred, would have altered the outcome of his trial. The Superior Court therefore did not act unreasonably in concluding that the *Strickland* standard had not been met.

Similarly, the Superior Court reasonably applied *Strickland* in concluding that Mr. Fitzgerald failed to show prejudice regarding his counsel's failure to challenge the application for the search warrants. Mr. Fitzgerald does not appear to suggest that the search warrants were generally defective—*e.g.*, that probable cause was lacking. Rather, his challenge is confined to the "no-knock" aspect. A "no-knock" warrant permits officers to enter a residence without announcing their presence where there has been a showing of a reasonable and particularized

suspicion that such an entry is necessary to prevent destruction of evidence, protect the officers' safety, or effectuate the arrest or seizure of evidence. *See, generally State v. Jones*, 846 A.2d 569, 580-82 (N.J. 2004) (analyzing both state and federal law). Mr. Fitzgerald argued to the PCR court that the warrants in question covered "nonviolent convictions" which are "insufficient" to raise concern for officers' safety. (Dkt. No. 13-13 at p. 33.)

The PCR court found, and the record reflects, that the application for the warrants contained numerous references to weapons having been reported in the possession of individuals alleged to be a part of the drug operation. (Dkt. No. 13-14 (State's Br.) at p. 20; *see also* Dkt. No. 13-4 at pp. 3-40.) That court therefore reasonably applied federal law in finding that a challenge to the "no-knock" provision would not have succeeded. Still less did he demonstrate a reasonable probability that but for counsel's failure to the contest the no-knock provision, the outcome of his state court proceedings would have been different. This claim therefore has no merit and will be denied.

### b. *Inadequate Pre-Trial Investigation, Failure to Call Favorable Witnesses, and Failure to Raise an Alibi Defense*

Mr. Fitzgerald argues that his trial counsel failed "to do any investigation in preparation" for trial. He claims that he was therefore "prejudiced because as a result of trial counsel's failure to prepare for trial, a witness who would have exonerated Petitioner and support his alibi defense [was] not interviewed and subpoenaed." (Dkt. No. 13-13 at p. 36.) The Superior Court concluded that Mr. Fitzgerald failed to establish prejudice regarding this claim. (*See, e.g.*, Dkt. No. 13-14 (State's Br.) at p. 21.) I find that the Superior Court's conclusion is a reasonable application of the *Strickland* standard.

The PCR court found (by way of its incorporation of the State's brief) that Mr. Fitzgerald for the most part did not even identify who the supposedly favorable witness or witnesses would

have been, regarding an alibi or anything else. There was one exception: Mr. Fitzgerald specifically identified his mother as a witness who would have testified that he was habitually intoxicated and easily influenced by family members:

> John Fitzgerald, never had any money, that they all ways had to give him five or ten dollars every other day themselves, that they had to take him every where that he went long distance in the City, that he had no place to live because he had no money, that he stayed with his mother every day and night, that he drank all of the time, and that if a member of the family would ask John Fitzgerald to do something for them, then he would do it without any type of questioning . . . that they talked on the telephone until they were blue in the face to other family members, about John Fitzgerald not having any money; job; drinking all of the time; and that he had no where to live.

(Dkt. No. 13-12 at p. 19.) The State argued that being susceptible to influence by others does not negate *mens rea* and that this testimony would not have been admitted at trial because it is "neither relevant nor probative." (Dkt. No. 13-14 at p. 21.) Even if the testimony were admissible, however, the Superior Court's determination that Mr. Fitzgerald failed to demonstrate prejudice on this issue was not unreasonable. (Dkt. No. 13-14 at p. 28.) The bias of a mother is of course, proverbial and obvious. Much of her testimony would have been cumulative in any event. Already admitted at trial was evidence that Mr. Fitzgerald was "high or drunk most of the time," but that "when the other defendants were around, John would do 'what he was supposed to do.'"[7] *Fitzgerald*, 2008 WL 2572617, at *8, *7.

Finally, even assuming that there was error, it was surely harmless. Given the other evidence—the testimony, the telephone intercepts, and the videotape of the undercover negotiation— the Superior Court did not unreasonably apply federal law or determine the facts in concluding that Mr. Fitzgerald failed to raise a reasonable probability that the outcome of the

---

[7]     Mr. Fitzgerald's co-defendants were his relatives. Testimony that "if a member of the family would ask John Fitzgerald to do something for them, then he would do it without any type of questioning" would have been at best a two-edged sword. It would not constitute a legal defense, but it would tend to confirm that Fitzgerald participated in criminal activity at his family members' behest.

trial would have been different had trial counsel called such a witness or raised an alibi defense. This claim therefore will be denied.

### c. Failure to Adequately Advise Defendant of a Plea Offer

As outlined above, the PCR court considered both an uncounseled *pro se* petition and a second, counseled petition. Both raised a claim that ineffective assistance of counsel prevented Mr. Fitzgerald from taking an advantageous guilty plea instead of going to trial. The two petitions raised the claim in a contradictory manner, however.

In his uncounseled PCR petition, Mr. Fitzgerald stated that his trial counsel informed him that counsel had a videotape of Mr. Fitzgerald "making a drug deal" with an undercover officer, and that he therefore "needed to think about pleading guilty." (Dkt. No. 13-12 at p. 13.) Mr. Fitzgerald states that he told his counsel that "if there is such a videotape, then [he would] plead guilty without any doubt." (*Id.* at p. 13-14.) Mr. Fitzgerald says that counsel represented that he possessed the videotape, but never actually showed it to Fitzgerald. Fitzgerald acknowledges, however, that he received a transcript of the videotape in February 2005. (*Id.* at p. 14.) A copy of the transcript, in which Fitzgerald negotiates a drug sale with an undercover officer, is in the record, and I have reviewed it. (Dkt. no. 13-14 at 31). Mr. Fitzgerald does not suggest in his *pro se* brief how viewing that video, as opposed to reading its contents, would have changed his decision whether to plead guilty. And if he is implying that the attorney was telling the truth about the video, but Fitzgerald did not believe him, that would not be grounds for finding the attorney ineffective.

In the other PCR petition, Mr. Fitzgerald's appointed counsel (not Fitzgerald himself) states that trial counsel gave Fitzgerald the "misadvice" that the videotape would be suppressed. PCR counsel seems to have been under the impression that Mr. Fitzgerald "lost the suppression

hearing." (Dkt. No. 13-14 at 5) Neither here nor before the PCR Court, however, was any record made of any such suppression motion, or suppression hearing, or any ruling thereon. The judge who presided at trial, in his PCR opinion, adopts the State's statement that no such motion was ever filed or decided. (Dkt. No. 13-14 at 22) At any rate, as the State pointed out, it is hard to imagine grounds for such a suppression motion; this was a consensual recording, made by the undercover agent, whose one-party consent was sufficient to validate the recording under State and federal law. *See Lopez v. United States*, 373 U.S. 427 (1963); 18 U.S.C. § 2511(2)(d); N.J. Stat. Ann. § 2A:156A-4. Prejudice is lacking.

PCR counsel also cited boilerplate law to the effect that counsel must communicate any plea offer to the client. There is no factual allegation, however, that there was any offer that trial counsel failed to communicate.

PCR counsel also argued that "[w]hat defense counsel told defendant to induce him to go to trial is not on the record and can only be determined with a hearing." (Dkt. No. 13-14 at 5) It is true, of course, that private conversations between Mr. Fitzgerald and his trial attorney are not of record. But Mr. Fitzgerald knows what they consisted of, and could allege their contents. The only thing he does allege, in his uncounseled submission, is that counsel only showed him the transcript, not the videotape itself. That in itself does not set forth grounds for a hearing, let alone for habeas relief. To obtain a hearing, a party must allege that there exists a dispute regarding facts of consequence to the disposition of the issue. The PCR court was not obligated to call a hearing on counsel's say-so, when the facts and allegations that might justify a hearing were fully within the defendant's knowledge.

The State's brief, adopted by the PCR court, also points out that Fitzgerald and his counsel failed to submit the transcripts of sessions at which any plea offer, and the reasons for its

rejection, were discussed. (Dkt. No. 13-14 at 22) For its part, the State represents that plea

negotiations broke down over the issue of whether Fitzgerald would cooperate and testify against

his codefendants. (*Id.*) Mr. Fitzgerald has not disputed this in his Petition or in his Traverse. He

does not even allege that he was willing to cooperate against his codefendant family members. In

short, there is no forthright allegation, let alone evidence, that there existed a plea offer that

Fitzgerald was willing to take.

I am confined to the record as it stood before the state courts. *Cullen v. Pinholster*, 563

U.S. 170, 181 (2011). In *Pinholster*, the United States Supreme Court emphasized that a habeas

court's "review under § 2254(d)(1) is limited to the record that was before the state court that

adjudicated the claim on the merits." 563 U.S. at 181. Indeed, § 2254(d)(1) refers in the past

tense to "a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved'

an unreasonable application of, established law." *Pinholster*, 563 U.S. at 182. "It follows that the

record under review is limited to the record in existence at the same time *i.e.*, the record before

the state court." *Id.*

> Section 2254(b) requires that prisoners must ordinarily exhaust state remedies
> before filing for federal habeas relief. It would be contrary to that purpose to
> allow a petitioner to overcome an adverse state-court decision with new evidence
> introduced in a federal habeas court and reviewed by that court in the first
> instance effectively *de novo*.

*Pinholster*, 563 U.S. at 182; *see also Moore v. DiGuglielmo*, 489 F. App'x 618, 625 n.3 (3d Cir.

2012) (noting that in *Pinholster*, "the Supreme Court limited the possibility of an evidentiary

hearing in district court to cases where § 2254(d)(1) does not bar federal habeas relief.") (citation

omitted).

Moreover, pursuant to AEDPA, "factual determinations made by a state court are

presumed correct and . . . the petitioner has the burden to rebut the presumption by clear and

convincing evidence." *Weeks v. Snyder*, 219 F.3d 245, 257 (3d Cir. 2000). This presumption of correctness applies whether the state court's findings are expressly stated or merely implicit. *Id.* at 258. Here, the PCR court—which also presided over Mr. Fitzgerald's criminal trial and was thus familiar with those proceedings—seems to have accepted that Mr. Fitzgerald's plea negotiations failed because he was not willing to cooperate in the prosecution of his co-defendants. Mr. Fitzgerald has failed to rebut that finding. Furthermore, Mr. Fitzgerald has explicitly admitted in his *pro se* brief that he was told of the videotape and given a transcript of its contents. The record therefore reflects that Mr. Fitzgerald possessed enough information about the tape to consider it in his evaluation of whether to enter a plea even without having viewed the actual recording. *See Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) ("In the context of a guilty plea, counsel is required to give a defendant information sufficient to make a reasonably informed decision whether to accept a plea offer.") (citing *United States v. Day,* 969 F.2d 39, 43 (3d Cir.1992)).

Where a petitioner challenges the effectiveness of counsel with respect to a plea decision, "[d]eference to the state court's prejudice determination is all the more significant in light of the uncertainty inherent in plea negotiations." *Premo v. Moore*, 562 U.S. 115, 129 (2011). Here, given the Superior Court's conclusion that Mr. Fitzgerald's plea negotiations stalled over the cooperation issue, Mr. Fitzgerald's own statements that he was aware of the audio contents of the videotape, and counsel's advice that Fitzgerald "needed to think about pleading guilty," I find that the Superior Court's conclusion that Mr. Fitzgerald had failed to demonstrate prejudice was a reasonable application of federal law.

Mr. Fitzgerald states that he told his counsel that if such a videotape existed he would plead guilty. It is undisputed that, possessed with knowledge of the tape's existence and its

contents, he did not do so. Mr. Fitzgerald therefore has not shown that there is a reasonable probability that but for his counsel's alleged errors, he would have pleaded guilty rather than proceeded to trial. Counsel's performance—informing Mr. Fitzgerald about the contents of the videotape and advising him that he should consider pleading guilty—was not objectively unreasonable. This claim therefore will be denied.

### 3. Ineffective Assistance of Appellate Counsel

Mr. Fitzgerald claims that his appellate counsel was ineffective for failing to argue on appeal that the elements of New Jersey's Leader of a Narcotics Trafficking Network ("Kingpin") statute were not satisfied at trial. This claim of ineffective assistance is unsustainable on this record. Mr. Fitzgerald's appellate counsel *did* raise this argument on appeal. In fact, this was the only one of Mr. Fitzgerald's claims that the Appellate Division discussed at any length. *See Fitzgerald*, 2008 WL 2572617, at *15-16. The Superior Court did not unreasonably apply clearly established federal law and did not unreasonably determine the facts in rejecting this ineffective assistance claim. The claim will be denied.

### 4. Additional Arguments Regarding Ineffective Assistance of Counsel

Mr. Fitzgerald adds two miscellaneous ineffective assistance claims: (1) "trial counsel's failure to raise an objection that the evidence was not sealed as required by law, and appellate counsel's failure to raise this issue on appeal," and (2) "ineffective assistance of trial counsel and appellate counsel due to trial counsel's failure to raise an objection to the chain of custody, as there were no chain of evidence reports for the wiretap warrants and applications." *See* Dkt. No. 13-13 at p. 35. Mr. Fitzgerald has made no effort to satisfy the *Strickland* standard regarding these claims. Specifically, he has not stated how these alleged deficiencies prejudiced him in any way. Nor has he made any effort to demonstrate or even allege that there is a reasonable

probability that but for these purported errors, the outcome of his appeal or trial would have been different. The Superior Court's determination that Mr. Fitzgerald failed to satisfy the *Strickland* standard was not an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts. This claim therefore does not warrant federal habeas relief and it will be denied.

## B.  Grounds Two, Three, and Four: Jury Instructions and Admission of Evidence

In Grounds Two, Three, and Four, Mr. Fitzgerald argues that the trial court (1) failed to adequately instruct the jury regarding accomplice liability; (2) erred by admitting in evidence the videotape of a meeting between Mr. Fitzgerald, an undercover police officer, and a confidential informant; and (3) failed to adequately instruct the jury regarding the limited admissibility of the videotape. Mr. Fitzgerald has not alleged that these actions violated any federal constitutional right. Indeed, Mr. Fitzgerald here relies solely on the brief his appellate counsel prepared and submitted to the state Appellate Division on direct appeal. *See* Petition at 8, 9, and 11. Those arguments in the Appellate Division rested entirely on New Jersey state law. There, as here, Mr. Fitzgerald did not argue that the trial court's jury instructions or its admission of the videotape violated any federal right. *See* Dkt. No. 13-2 at pp. 22-27; 28-34; 54-56.[8] Because the state court's decisions regarding alleged violations of state law are not cognizable as bases for federal habeas relief, these grounds are rejected.

---

[8]       Specifically, with respect to the trial court's jury instruction on accomplice liability, Mr. Fitzgerald relied on New Jersey Supreme Court precedent, New Jersey law regarding accomplice liability and conspiracy, and the New Jersey Criminal Model Jury Charges to argue that the trial court misapplied state law on these matters. As for the videotape, Mr. Fitzgerald again relied on New Jersey Supreme Court precedent and New Jersey Rules of Evidence to argue that the tape was admitted in violation of New Jersey law. Similarly, regarding the jury instruction on the limited admissibility of the videotape, Mr. Fitzgerald argued that the instruction did not sufficiently or adequately conform to the requirements of the New Jersey Rules of Evidence. The Appellate Division concluded that these claims had "insufficient merit . . . to warrant discussion in a written opinion." *State v. Fitzgerald*, 2008 WL 2572617, at *11. It does not appear that there was even a violation of State law, let alone one that might rise to the level of a constitutional due process violation.

As discussed above, a writ of habeas corpus may be granted only where a petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254. The Supreme Court has made clear that "federal habeas corpus relief does not lie for errors of state law" and that a federal court may not "re-examine state court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also*, *Barkley v. Ortiz*, 209 F. App'x 120, 124 (3d Cir. 2006) (federal court could not review Appellate Division's rejection of petitioner's argument that jury instructions violated New Jersey law); *Kontakis v. Beyer*, 19 F.3d 110, 117 (3d Cir. 1994) ("[W]e will not review the Appellate Division's evidentiary ruling for errors of state law as if we were the New Jersey Supreme Court"). Here, Mr. Fitzgerald presented only state-law arguments to the New Jersey Appellate Division on these points and has merely incorporated those same arguments into his Petition for habeas relief. He therefore has failed to assert cognizable claims and is not entitled to federal relief on these grounds.

The Court of Appeals' decision in *Barkely v. Ortiz* is illustrative. There, the petitioner argued that the New Jersey Appellate Division erred when it rejected his argument that the trial court's jury instruction on accomplice liability was improper. 209 F. App'x at 124. In his state court appeal, the petitioner did not argue "that the trial court's allegedly improper jury instructions ran afoul of any federal constitutional provision," but instead argued that the instructions violated New Jersey law as set forth in New Jersey Supreme Court precedent. *Id.* The Court of Appeals determined that it "may not review the New Jersey Superior Court's rejection of these arguments." *Id.* (citing *Estelle*, 502 U.S. at 67-68). The court further explained:

> In analyzing a habeas petition, we evaluate the relevant state court's application of federal law and determine whether that reasoning comports with precedent. Here, the New Jersey Superior Court did not apply or analyze federal law because Barkley did not prompt it to do so. Therefore, Barkley's claim that the New Jersey Superior Court improperly ruled on his jury instruction argument cannot give rise to habeas relief.

*Id.* For the same reasons, Mr. Fitzgerald's Grounds Two through Four do not set forth a basis for federal habeas relief.[9]

## C. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, this Court rules that a certificate of appealability shall not issue in this case.

## V. CONCLUSION

For the foregoing reasons, Mr. Fitzgerald's habeas petition will be denied and a certificate of appealability shall not issue. An appropriate order will be entered.

DATED: May 4, 2018

KEVIN MCNULTY
United States District Judge

---

[9] Mr. Fitzgerald's failure to raise federal claims before the New Jersey courts also raises a question as to whether such claims are procedurally defaulted. *See e.g.*, *Hull v. Kyler*, 190 F.3d 88, 97 (3d Cir.1999) ("If state avenues of relief, including post-conviction proceedings, have been exhausted, but the petitioner has failed to raise the alleged grounds for error, the claim is procedurally defaulted and may not be raised in federal court."). The issue is more fundamental than mere failure to exhaust; as to grounds Two, Three, and Four, Mr. Fitzgerald has not raised federal claims *either* before the state court *or* in his Petition before this Court. He therefore has not met his burden to show entitlement to habeas relief.